## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Bradley M. Peterson, PhD | ) | |
| 8180 Linden Leaf Circle | ) | |
| Columbus, OH 43235 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | Judge |
| Kristina M. Johnson, PhD | ) | Magistrate Judge |
| President, The Ohio State University | ) | |
| 1590 North High Street, Suite 500 | ) | JURY TRIAL DEMANDED |
| Columbus, OH 43210 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Bruce A. McPheron, PhD | ) | |
| Executive Vice President and Provost | ) | |
| 210 Bricker Hall | ) | |
| 190 North Oval Mall | ) | |
| Columbus, OH 43210 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff Bradley Peterson, PhD ("Dr. Peterson"), by and through counsel, and for his Complaint against Defendants (hereinafter individually referred to as "Johnson," and "McPheron" and collectively referred to as "Defendants") states as follows:

## NATURE OF THE CASE

1.      After a distinguished career contributing to the growth and success of The Ohio State University ("OSU"), Defendants abruptly revoked Dr. Peterson's emeritus status and banned him from campus, which also caused him to lose significant career opportunities for which he had a legitimate claim of entitlement through a discriminatory and procedurally flawed process. Dr. Peterson was found responsible for harassment based on allegations that were not true and, even

if true, do not rise to the level of harassment. In finding Dr. Peterson responsible, OSU relied on an unfair investigation that deprived him of due process. The investigation disregarded and purposefully excluded evidence Dr. Peterson provided, including information casting doubt on the credibility of the accusers from the investigation report to deny Dr. Peterson the right to cross examination. Dr. Peterson was not provided notice of all allegations against him or a full opportunity to present evidence or witnesses in front of a fair and neutral investigator. Dr. Peterson was not provided a hearing or the right to cross-examine his accusers or witnesses. Defendants' actions removing Dr. Peterson from his position violated Dr. Peterson's constitutional rights. Therefore, Dr. Peterson brings this action pursuant to 42 U.S.C. § 1983.

2.     OSU took this action against Dr. Peterson because of his gender. OSU is under immense pressure to harshly discipline males accused of sexual misconduct in the wake of years of negative publicity relating to its handling of sexual misconduct allegations, starting with an investigation by the U.S. Department of Education's Office of Civil Rights and most recently with the Strauss lawsuits and settlements. Peterson agrees that OSU should be taking allegations of sexual harassment and misconduct seriously, but the allegations here do not rise to the level of harassment. One person got upset with Dr. Peterson's mannerisms and gathered several others to file complaints about him making them feel "uncomfortable" with his manner of communication and interacting. The result of the investigation was a foregone conclusion because of Dr. Peterson's gender.

## **PARTIES**

3.     Plaintiff Bradley Peterson, PhD is an Ohio resident living at 8180 Linden Leaf Circle, Columbus, OH 43235.

2

4.     Defendant Kristina M. Johnson, PhD is, and at all material times to this Complaint, was the President of OSU. OSU is a state actor and has empowered Johnson to take administrative action against Dr. Peterson under color of state law. She has a principal place of business at 205 Bricker Hall, 190 North Oval Mall, Columbus, OH 43210. Johnson is sued in her individual and official capacities. Johnson has been acting under the policies, procedures, and practices of OSU and, in particular, those policies implementing OSU's Sexual Misconduct Policy 1.15, sexual harassment.

5.     Defendant Bruce McPheron, PhD, was at all material times to this Complaint, Executive Vice President and Provost of OSU. OSU is a state actor and has empowered McPheron to take administrative action against Dr. Peterson under color of state law. He has a principal place of business at 210 Bricker Hall, 190 North Oval Mall, Columbus, OH 43210. McPheron is sued in his individual and official capacities. McPheron has been acting under the policies, procedures, and practices of OSU and, in particular, those policies implementing OSU's Sexual Misconduct Policy 1.15, sexual harassment.

6.     Defendants are authorized to grant all the relief sought in this Complaint.

7.     OSU is a public university created by the Ohio Legislature. OSU has a principal place of business in Columbus, Ohio. The Board of Trustees is the governing body of OSU. The Board of Trustees consists of 17 governor-appointed trustees who are responsible for oversight of academic programs, budgets and general administration, and employment of faculty and staff.

## JURISDICTION AND VENUE-

8.     This case arises under the laws of the United States, specifically 42 U.S.C. § 1983 and § 1988. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

9.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. At all relevant times, Defendants were residents of the state in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### *A Distinguished Career that Contributed to the Rise of OSU*

10.     Dr. Peterson obtained his PhD from the University of Arizona in 1978. He first came to OSU in 1979 as a Postdoctoral Researcher, but within months of his arrival, was hired as an Assistant Professor. In 1984, he was promoted to Associate Professor with tenure. In 1991, he was promoted to the rank of Professor. He was appointed as Vice Chairman of the Department of Astronomy in 2004. In 2006, he was appointed Chair of the Department of Astronomy and held that position until his retirement in 2015.

11.     During his career at OSU, Peterson taught courses at all levels, from freshman-level introductory astronomy to advanced graduate courses in astrophysics. He designed much of the astronomy curriculum throughout his tenure. He also taught advanced short courses in Brazil, Chile, Italy, Mexico, Poland, and Spain and was the Niels Bohr Lecturer in Copenhagen, Denmark, the Duncan Lecturer at Auburn University, and the Bruno Rossi Lecturer in Florence, Italy. He wrote the widely used graduate textbook "Introduction to Active Galactic Nuclei" and, with OSU Professor Barbara Ryden, wrote a market-leading astrophysics text, "Foundations of Astrophysics;" both books are published by Cambridge University Press.

12.     Dr. Peterson is a leader in quasar research and is responsible for developing the methods that are most commonly used to measure the masses of the supermassive black holes that are at the heart of quasars. He led two large international consortia that used NASA space telescopes and a network of ground-based telescopes to exploit these methods. Throughout his

4

career, he brought in steady funding to OSU from the National Science Foundation and NASA. He also played a key role in securing OSU's participation in the Large Binocular Telescope, one of the largest ground-based telescopes in the world. Peterson has served Space Telescope Science Institute ("STScI") in numerous capacities, including chairing the Hubble Space Telescope Time Allocation Committee in 2015 and serving as a member of the James Webb Space Telescope (JWST) Advisory Committee. He has also served on numerous committees, panels, and task forces for NASA, most recently as a member of the NASA Advisory Council (NASA's highest-level external advisory body) for which he also chaired the Science Committee. In 2016, Peterson was asked by NASA Headquarters to co-chair, with Professor Debra Fischer of Yale University, the Science and Technology Definition Team (STDT) for a future space telescope concept known as the Large Ultraviolet Optical Infrared Surveyor (LUVOIR). As a result of this study, the National Academy of Sciences has recently recommended to NASA that such a telescope be developed for implementation in the 2040s; the LUVOIR STDT was recognized by NASA Headquarters with a Group Achievement Award and by NASA's Goddard Space Flight Center with the Robert H. Goddard Exceptional Achievement Award for Science. Peterson's personal recognitions include the Distinguished Scholar Award from OSU (2010), the Outstanding Achievement Award from his alma mater, the University of Minnesota (2016), and the NASA Exceptional Service Medal (2018). Peterson is also an elected Fellow of the American Association for the Advancement of Science for which he served a term as Chair of the Astronomy Section. In the early 1980s, the OSU Astronomy graduate program was ranked in the mid-twenties by the National Research Council. By 2010, OSU Astronomy had moved into the top 10.

13.     On June 30, 2015, Dr. Peterson retired from OSU and David Weinberg, PhD, became the chair of the astronomy department. Following his retirement, Dr. Peterson was granted emeritus status.

14.     In August 2016, Dr. Peterson started a position as Distinguished Visiting Astronomer at the Space Telescope Science Institute ("STScI"). From August 2016, he was a term (non-tenured) full-time paid member of the STScI Science Staff. His paid appointment ended in September 2018, but he retained the title and a courtesy (unpaid) appointment that would allow him continued access to STScI resources and allow him to continue to contribute to the scientific life of STScI. Peterson's functional responsibilities at STScI were twofold: (1) to utilize the resources of STScI and the nearby NASA Goddard Space Flight Center to support the LUVOIR study and (2) to advise the STScI Director on how to better manage the burgeoning science staff, which had grown to over 130 PhD astronomers in anticipation of the JWST mission. Regarding the latter point, Peterson had developed a good reputation for managing scientists. A particular concern of the STScI leadership was their long-standing reputation for being less than "female friendly" and Peterson was asked to be mindful of this and to offer advice on how to improve the professional climate for women at STScI because of his past success with assisting female scientists to succeed.

15.     In October 2018, Dr. Peterson returned to OSU full-time as an emeritus professor but continued his (1) preparation of the LUVOIR study for presentation to NASA and the National Academy of Sciences, (2) original research on the inner structure of quasars, and (3) preparation of a second edition of "Foundations of Astrophysics", which remains very popular, but was becoming dated as a consequence of rapid advances in the field. As an emeritus professor, Dr.

Peterson was retired, but he and OSU continued their relationship for both to benefit from his stature and ongoing research.

### *Harassment Complaint*

16.     Prior to his retirement, Dr. Peterson had no complaints filed against him and no disciplinary issues during his 36 years of employment at OSU.

17.     However, approximately one week after his return to OSU full-time in October 2018 as a retired professor, Weinberg notified Dr. Peterson that some women in the astronomy department felt uncomfortable with his return. Weinberg declined to provide Dr. Peterson with any specific information but told Dr. Peterson to avoid hugs and casual touching and to avoid having dinner with younger female colleagues alone, but not to avoid one-on-one meetings with female colleagues. Dr. Peterson was not disciplined and was not provided notice of who filed the complaints or the specifics of any complaint. Weinberg instructed Dr. Peterson not to investigate the allegations. Dr. Peterson was provided no opportunity to defend himself against these allegations. Dr. Peterson did, however, modify his communication style, which involved casual touches and non-sexual hugs, and did not invite any female colleagues to meals.

18.     Despite modifying these behaviors as instructed and hearing nothing more of the issue, Dr. Peterson was informed in late April 2020 that three women had banded together to file a harassment complaint against him. Weinberg initiated the complaint on or about April 6, 2020, with OSU's Office of Institutional Equity ("OIE") without notification or discussion with Dr. Peterson. The complainants were Laura Lopez, Assistant Professor of Astronomy at OSU, Amy Sardone, NSF Postdoctoral Fellow, OSU Department of Astronomy, and Emily Margolis, Graduate Student in Department of History of Science and Technology, John Hopkins University.

19.     Remarkably, after his esteemed career at OSU, Dr. Peterson was subjected to an unfair and biased Title IX process that deprived him of liberty and property interests without due process relating to allegations that were years old, did not involve conduct, employees, or students of OSU, and involved individuals over whom Dr. Peterson held no supervisory position.

20.     As described in detail below, none of the allegations rose to the level of harassment, but OSU conducted an unfair and biased investigation designed to find Dr. Peterson responsible to avoid additional negative publicity in the wake of years of negative publicity about its handling of harassment complaints. *See, e.g.*, https://news.osu.edu/ohio-state-announces-new-settlement-program-for-survivors-in-remaining-strauss-cases/ (last accessed Jan. 6, 2022), https://www.daytondailynews.com/news/osu-employees-failed-report-sexual-assault-called-survivors-delusional/J7L6xdH7cmgLKiHf7g1aCK/ (last accessed Jan. 6, 2022); https://www2.ed.gov/about/offices/list/ocr/docs/investigations/15106002.html (last accessed Jan. 6, 2022). This desire has led OSU to discriminate against males accused of sexual harassment and deny those individuals, such as Dr. Peterson, due process.

### *Complaint from Lopez: No Good Deed Goes Unpunished*

21.     Shortly before his retirement in Spring 2015, Lopez was visiting OSU prior to her employment beginning in fall 2015. Coordination of such visits was delegated to the Chair of the Faculty Search Committee, Professor Scott Gaudi. Dr. Peterson was not coordinating the visit. Late in the day, however, he learned that no one had organized a dinner for Lopez, which was standard practice in the department. Dr. Peterson went around the department attempting to organize a group to go to dinner, but no one could join as it was late in the day and people had left or already had other commitments. As a result, Peterson cancelled his own plans and took her to

dinner at Marcella's in the Short North. Dr. Peterson took her to dinner to avoid any perception that she was being treated differently from other new hires.

22.     Lopez started work at OSU in the fall 2015. Apparently, in November 2015, Lopez told Weinberg that she felt uncomfortable during the dinner when she visited earlier in the year because it was just her and Dr. Peterson. Weinberg is a mandatory reporter of harassment at OSU and determined that the information he received did not necessitate a complaint to OSU or even discussion with Dr. Peterson. Weinberg's failure to file a report or to discuss the dinner complaint with Dr. Peterson deprived him of notice and the opportunity to present evidence and witnesses to defend himself.

23.     Remarkably, Lopez brought an official complaint about this dinner in early 2020, five years later and after Weinberg had already handled in the manner he determined was appropriate at the time he received the complaint in 2015. Lopez's complaint was that the dinner was just the two of them, that Dr. Peterson ordered wine, that he sat in a seat next to her instead of across from her, and that he touched her arm and back when speaking with her. Lopez included in her complaint every other potentially offensive comment or action Dr. Peterson may have made since, none of which were sexual in nature or would be offensive to a reasonable person.

24.     During his interview into Lopez's complaint, Dr. Peterson told the investigator that he attempted to organize a group dinner, but no one else was available and ended up alone out of an attempt to be kind and hospitable. None of this testimony was included in the investigation report and no witnesses were asked questions about this explanation. Dr. Peterson further explained that he sat next to Lopez because the restaurant was loud, that he normally orders wine with dinner, and he often touches both males and females on the back and arm when speaking with them. None of this was included or investigated either.

9

25.    Lopez championed the complaint against Dr. Peterson. She created a perception in others that Dr. Peterson was harassing and encouraged others to join her complaint. She called and asked others to join the complaint. She took the opportunity afforded by an OSU women's astronomy luncheon to complain about Dr. Peterson and gather others to join her complaint. The best anyone could come up with in the complaints was non-sexual touching and a general feeling of discomfort.

### Complaint from Sardone: Rumors

26.    In early 2020, Peterson spoke to Sardone about her Galaxies Discussion Group to see whether there was any interest in his work about active galaxies and if he was interested in their work on quiescent (non-active, or normal) galaxies. Peterson attended a few meetings and determined there was no mutual interest. Sometime around late March or early April 2020, Peterson informed Sardone that he would no longer attend the Galaxies Discussion Group. The decision to leave was academic and before Dr. Peterson was aware of the harassment complaint. His attendance at these meetings was included in the harassment complaint, but there was no investigation into this and no evidence that Dr. Peterson engaged in any harassing behavior during the meetings.

27.    Sardone was a National Science Foundation postdoc in astronomy who started at OSU after Dr. Peterson had retired. As an emeritus professor, Dr. Peterson had no ability to impact the terms and conditions of her employment. It is difficult to determine what the nature of Sardone's complaint was against Dr. Peterson, other than hearing rumors about him from Lopez. Sardone complained, basically, that Dr. Peterson spoke with her and discussed with her generally topics of harassment claims in academia, his feelings of being unwelcome after returning from Baltimore, and other general discussions, none of which were sexual in nature. She admitted there

was no touching and that she never saw Dr. Peterson touch others but felt uncomfortable at work because she had heard rumors that he sometimes hugged others. In other words, it was a pile-on complaint based on rumors.

### *Complaint from Margolis: Friendship with ZERO Connection to OSU*

28.     In January 2018, while working in Maryland, Dr. Peterson met Margolis at a birthday party for a mutual friend in Virginia and struck up a friendship.  Between February to April 2018, Dr. Peterson and Margolis had dinner approximately three times in Baltimore.

Margolis had no affiliation with OSU, she was a history of science student at Johns Hopkins University. Although Dr. Peterson did not flirt with Margolis and was not pursuing any relationship aside from friendship, OSU had no authority to initiate an investigation into a complaint from an individual with no affiliation to OSU, and who was studying history at Johns Hopkins, which is an area of study and at an institution over which Dr. Peterson has no overlap or connection. OSU cannot regulate the relationships of its professors with individuals with no association to OSU or the department in which that professor is associated. Margolis's allegations involve invitations to get together, no touching, no inappropriate comments, and no sexual advances.

### *The Biased Investigation Designed Only to Gather Evidence to Find Guilt*

29.     As stated above, the official complaint against Dr. Peterson was initiated in April 2020 by Weinberg based on an undated complaint from Sardone. OIE assigned Defendant Allan Williams to conduct the investigation. Williams met with the complainants and witnesses from April 3-23, 2020. Instead of being interviewed, Margolis opted to submit a written statement and

submitted that to Williams on April 27, 2020. On that same day, OSU finally took the time to notify Peterson about the complaint and pending investigation.

30.     On April 28, 2020, Peterson wrote to Mr. Williams denying all allegations and questioning the credibility of the accusers.

31.     On April 29, 2020, Mr. Williams met with Dr. Peterson. Mr. Williams misled Dr. Peterson into believing that his interview on April 29, 2020, was the early stages of the investigation and that Dr. Peterson would have further interviews and opportunity to submit evidence. It turned out to be Dr. Peterson's only involvement in the investigation. Dr. Peterson was provided incomplete and perfunctory notice about some of the allegations prior to his interview but learned of most of the allegations during the interview.

32.     In addition to what is stated above, during the interview, Dr. Peterson denied all allegations of harassment. Dr. Peterson explained that none of the alleged comments from any of the witnesses were sexual in nature and that he touched people as part of his communication style. Dr. Peterson expressed surprise that the complainants felt the way they did because he had no intentions of harassment or creating the perception alleged in the complaint. Dr. Peterson stated that he stopped any such behaviors and modified how he used to interact after his conversation with Weinberg in October 2018.

33.     Dr. Peterson asked Williams how long the case would take to resolve and what the possible outcome would be. Williams responded that the case would be wrapped up in a matter of a few weeks (it took 8 months) and he thought a likely sanction would be possible "awareness" seminars or meetings with HR. Williams never mentioned that Dr. Peterson's emeritus status could be revoked.

34. Williams never contacted Dr. Peterson for additional information after his interview on April 29, 2020. Dr. Peterson wrote to Williams on June 10, 2020, asking for an update on the investigation. Williams never responded. Dr. Peterson asked for a university representative to guide him through the process and was denied that opportunity.

35. During the investigation, OSU allowed an individual named as a witness to join in the complaint as an additional complainant. This occurred after Dr. Peterson was interviewed. Complainant #4 was Susan Kassin PhD. Dr. Peterson was not provided notice of this additional complaint, the name of Complainant 4, the names of any witnesses, or access to any of the statements or investigation materials. Williams did not schedule a follow-up interview with Dr. Peterson concerning Kassin's complaint. Thus, Dr. Peterson never had an opportunity to respond to the allegations contained therein, which was a complaint that included no specific interaction, but a general complaint that Dr. Peterson's general interactions made her feel uncomfortable. The examples included in the investigation report were occasionally putting his hand on her arm or shoulder and standing too close. She also complained about Dr. Peterson asking her to discuss professional topics which she interpreted as a cover for harassing intents, but with no actual harassment observed or reported. Kassin admitted that when she denied requests to interact with Dr. Peterson there was no consequence.

36. Had Dr. Peterson been interviewed, he would have denied all Kassin's allegations, as he did with the other complainants, and would have provided information to the investigator to question her credibility. For example, Kassin claims to have been uncomfortable with Dr. Peterson when he was her colleague at STScI from 2016-2018, yet she had dinner alone with him when he returned for a visit to Baltimore 13 months later in November 2019. Further, and most importantly, Dr. Peterson held no supervisory or other authority over Kassin at any time. She had tenure in an

institute in which Dr. Peterson was on a temporary appointment with no administrative authority. Thus, Dr. Peterson had no ability to impact the terms and conditions of her employment. Although Dr. Peterson interacted with her only as friends, assuming *arguendo*, that he was flirtatious with her, it is not unlawful for him to flirt with someone affiliated with an institute at which he is working for which he has no supervisory authority. OSU has no policy prohibiting Dr. Peterson from having a relationship with a tenured staff member from another institution.

37.     Dr. Peterson spoke with Kassin often about professional matters to aid him in assessing the professional climate for women at STScI. This was one of his functional duties at STScI. Kassin was especially helpful as one of the younger women at STScI and because she was forthcoming about the professional climate at STScI. Dr. Peterson wrote a report to the STScI Director in 2018 May advising him of changes that should be made to the promotion and tenure criteria to improve the professional climate for women at STScI. The recommended changes were made.

38.     Mr. Williams purposefully excluded material information Dr. Peterson provided in his interview from the investigation report. Dr. Peterson disputed all allegations and disputed the credibility of his accusers. However, the investigator either omitted or changed Dr. Peterson's testimony to create the false impression that there was no credibility dispute to avoid providing Dr. Peterson a hearing with the right to cross examination.

39.     Mr. Williams also purposefully excluded or failed to obtain exculpatory information from the investigation report. OSU presumed Dr. Peterson guilty, and the investigation was designed only to gather information to support a finding of a policy violation. For example:

> a.  Dr. Peterson informed Mr. Williams that the reason he took Lopez to dinner alone was that the faculty person responsible for her interview failed to organize a dinner

for her during her onboarding process, which was standard in the department. Dr. Peterson told Mr. Williams that he went around the department asking multiple other people to attend dinner with Lopez, but he could not find anyone else to attend. He went to dinner with her because he felt it rude not to do so as had been done with all other interviewing professors in the department. Dr. Peterson provided a detailed account of this explanation, but it was completely excluded from the investigation report.

b. Dr. Peterson informed the investigator that he hugs and casually touches people— both male and female—but there was no investigation to determine if this was true.

c. Mr. Williams did not ask Dr. Peterson for the names of any witnesses. Dr. Peterson could and would have provided such information if he knew it was necessary.

d. Mr. Williams made no attempt to obtain exculpatory information or question why there was a sudden cluster of complaints after a 36-year spotless record at OSU, which included mentoring (i) four female PhD students (out of nine total), (ii) three female visiting PhD students from Europe and South America who spent several months with him, (iii) two female postdocs, (iv) four female undergraduate researchers, plus (v) many informal female mentees both at OSU and other institutions. Dr. Peterson has trained more female scientists than anyone else in the history of OSU's Department of Astronomy and been a champion for females in a male-occupied space. Yet, none of this was considered and none of these individuals were contacted. Notably, following OSU's harsh removal of Dr. Peterson from OSU with the libelous statement that he engaged in years of harassment, numerous females and males who worked closely with Dr. Peterson

15

wrote to Johnson after the matter was finalized to inform her that the results of the investigation were erroneous and offering to provide testimony to support Dr. Peterson. Had a complete and unbiased investigation happened, this evidence and testimony would have been gathered. It is impossible for OSU to have determined that Dr. Peterson engaged in twenty plus years of harassment without interviewing other employees who worked with Dr. Peterson in the department during this time period.

e.  Lopez complained that she was warned by others about Dr. Peterson, but the investigator did not ask or include information about the source of this hearsay.

f.  Margolis claimed to have correspondence documenting the alleged harassment, but it was either not asked for, asked for and excluded from the report, or not in existence.

g.  Dr. Peterson explained to the investigator that he modified his communication style, after the conversation with Weinberg when he returned to OSU full-time in 2018. There was no investigation into the timing of any allegations to determine if Dr. Peterson did modify his actions after the conversation.

h.  The complainants describe interference with their work, but there was no investigation done into this other than accepting their word.

i.  Dr. Peterson was found responsible for twenty plus years of harassment based on complaints from individuals who had only known or worked with him for the last few years. Remarkably, there was no investigation with individuals who worked with Dr. Peterson longer.

16

40.     Additionally, Mr. Williams also misstated the testimony of witnesses in the investigation report. Witness 2 informed Peterson she was never provided an opportunity to review her statement. Peterson provided the report to her after the investigation was complete. After she reviewed the report, she was infuriated because the account of her testimony was not accurate and omitted several parts of what she said. Further, Witness 2 was upset because the investigator did not ask her about the dinner with Lopez because she recalled discussing it with Dr. Peterson at the time. Had Williams done a fair and impartial investigation, he would have verified Dr. Peterson's testimony in this regard. Witness 2 also verified that other information she provided to demonstrate that the allegations were false and based on untrue rumors was not included in the report.

41.     The other witness testimony confirmed nothing other than hearing Lopez and Sardone air their grievances against Dr. Peterson. The witnesses confirm their surprise or that the alleged behaviors that allegedly made people feel uncomfortable were harmless ways in which Dr. Peterson interacted prior to the concerns being raised against him. The witnesses confirm that Dr. Peterson modified his behavior after being made aware that some of his manners of communicating made others uncomfortable.

42.     On February 1, 2021, Dr. Peterson received the investigation report from Williams. The report concluded that Dr. Peterson had violated OSU's Sexual Misconduct Policy 1.15, sexual harassment because of his non-sexual hugging and touching of others on the arm or shoulder during conversation and inviting female colleagues to dinner (with no investigation into whether he touched male colleagues similarly or invited male colleagues to dinner). Astonishingly, the OIE report concluded that the Complainants provide a twenty-plus year history of harassment. This is untrue and unsupported. The earliest complaint was in 2015 and none of the complainants even worked at OSU when Dr. Peterson was chair of the department.

43.     On February 2, 2021, Dr. Peterson contacted Williams to ask for a faculty advocate to obtain assistance prior to a final ruling. Williams never responded. Dr. Peterson had not previously sought assistance or counsel based on assurances from Williams that the possible outcome was awareness training or meetings with HR.

44.     On February 10, 2021, Interim Chair of Astronomy Todd Thompson and Divisional Dean Susan Olesik informed Peterson via Zoom that the OIE Report and OSU policy allow no course other than to recommend revoking Dr. Peterson's emeritus status. Accordingly, Drs. Thompson and Olesik wrote to Gretchen Ritter, Executive Dean and Vice Provost of the College of Arts and Sciences to recommend revocation of emeritus status on that same day. They accepted the finding of the investigation report, including but not limited to the finding that the report documented "behavior over the course of twenty plus years" even though the investigation only covered alleged conduct from 2015-2020.

45.     On February 18, 2021, Dr. Ritter wrote to McPheron endorsing Drs. Thompson and Olesik's recommendation to revoke Dr. Peterson's emeritus status.

46.     On May 17, 2021, Johnson informed Peterson that she would recommend revocation of his emeritus status to OSU's Board of Trustees during their meeting on May 19-20, 2021. In the letter to the Board of Trustees, Johnson mischaracterized the situation and stated that Dr. Peterson had engaged in persistent and pervasive harassment for twenty years. As with the other administrators involved, she accepted the OIE Report without independently reviewing the information.

47.     The Board of Trustees accepted Johnson's recommendation and revoked Dr. Peterson's emeritus status on May 20, 2021. The decision was widely publicized and made known to the public.

48.     In accordance with OSU's Bylaws and Rules, Dr. Peterson was a faculty member of OSU. *See* Chapter 3335-5-19, Faculty ("As used in these rules the term "faculty" shall include persons appointed by the Board of Trustees with tenure-track and non-tenure track titles on full or part-time appointments, with or without salary, and emeritus faculty.")

49.     Dr. Peterson was granted emeritus status upon his retirement due to his accomplishments, contributions to OSU, age, and years of service. *See* OSU's Bylaws and Rules, Chapter 3335-5-36(A).

50.     OSU investigated and disciplined Dr. Peterson pursuant to its Sexual Misconduct Policy 1.15. Unlike other faculty, however, OSU provided Dr. Peterson with no hearing, no right to cross-examination, and no appeal process.

51.     Dr. Peterson held a constitutionally protected property interest in his emeritus status. Dr. Peterson's emeritus status was necessary to his scholarship and standing in the academic community. Based on OSU's report and revocation of Dr. Peterson's emeritus status, the organizations with which Dr. Peterson had relationships with to perform research, writing, and other work ended their relationship with him.

52.     As a result of OSU's actions, Dr. Peterson has been deprived of the following protectable property and liberty interests without due process: (a) his emeritus status at OSU and all related benefits; (b) his position as Distinguished Visiting Astronomer at STScI; (c) loss of his large Hubble Space Telescope science program, which others will now complete and receive the recognition; (d) loss of his textbook contract with Cambridge University Press after six months of work on a second edition; and (e) permanent reputational damage and loss of earnings.

53.     Regarding the Cambridge University Press textbook contract, Dr. Peterson was informed the decision to revoke the contract was largely based on President Johnson's "harsh and

unequivocal" statement that the actions were "persistent and pervasive." This description is inaccurate because the investigation report does not support a finding that Dr. Peterson engaged in persistent and pervasive harassment.

54.     OSU deprived Dr. Peterson of the property interest in his emeritus status without due process. For example:

**a.** Dr. Peterson was not provided notice of the allegations against him;

**b.** Dr. Peterson was not afforded a fair investigation with neutral and unbiased investigators and decision makers;

**c.** Dr. Peterson was not provided the right to cross-examination even though the case involved allegations of sexual misconduct and hinged on credibility determinations; and

**d.** OSU included in the investigation complaints outside the jurisdiction of the Sexual Misconduct Policy.

55.     OSU found Dr. Peterson responsible based on pressure arising from prior investigations by the DOE into its handling of sexual misconduct cases, the Strauss investigation, and being forced to shutter its Office of Sexual Civility and Empowerment, which it formed to settle the DOE's investigation into its handling of sexual misconduct claims. Due to this pressure, OSU took the unnecessary step of referring the matter to the Board of Trustees resulting in widespread publication and causing damages to Dr. Peterson.

**COUNT I**
**(42 U.S.C. § 1983 – VIOLATION OF FOURTEENTH AMENDMENT**
**DUE PROCESS PROVISION OF UNITED STATES CONSTITUTION)**

56.     Plaintiff incorporates the allegations of the foregoing Paragraph Nos. 1-54 as if fully restated herein.

57.     This count is brought against the individual defendants in their official capacity for injunctive relief.

58.     This count is brought against the individual defendants in their individual capacity for damages.

59.     The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

60.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

61.     The Due Process Clauses of the United States Constitutions apply to higher education investigation procedures and disciplinary decisions, including sexual harassment investigations that have the potential to result in loss of reputation, employment, or status.

62.      Defendants, through their exercise of state action, had an obligation to provide a fundamentally fair and reliable investigation process when affecting Waters' liberty and property interests, and that fundamentally fair and reliable investigation process must meet constitutional due process requirements.

63.     As the subject of a sexual harassment investigation process, Dr. Peterson was entitled under the Constitution of the United States to have adequate notice of the charges affecting his reputation and livelihood, and to be heard in a meaningful manner during the investigation before the results of the investigation were determined and published.

64.     Through policies, practices, and procedures of OSU, Dr. Peterson has a constitutionally protected property interest in his employment by OSU.

65.      Defendants failed to provide required procedural and substantive due process

requirements to Dr. Peterson during the investigation or before subsequent publication of the results of the investigation.

66.     Defendants engaged in the repeated subsequent publication of stigmatizing information as detailed in this Complaint. By doing so, the Individual Defendants, individually, and through their authorized agents, publicized additional unfounded and stigmatizing statements impugning Dr. Peterson's honesty and morality. These statements included, but are not limited to, those identified earlier in this Complaint.

67.     Defendants did not provide Dr. Peterson a meaningful opportunity to clear his name or rebut the statements.

68.     Defendants have acted under color of law in violating Dr. Peterson's rights under the Fifth and Fourteenth Amendments to the United States Constitution. Defendants acted intentionally and with callous disregard for Plaintiff's clearly establishedconstitutional rights.

69.     Defendants have acted intentionally and with callous disregard for Dr. Petersons clearly established constitutional rights.

70.     Defendants' actions as detailed above are so unjust that it shocks the conscience.

71.     As a direct and proximate result of Defendants' violations of Dr. Peterson's constitutional rights, he has suffered severe and substantial damages. The damages include lost career and business opportunities, lost income, diminished earnings capacity, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

72.     Pursuant to 42 U.S.C. §1983, Defendants are liable to Dr. Peterson for his damages.

73.     Pursuant to 42 U.S.C.§ 1988, Dr. Peterson is entitled to his attorney's fees incurred in bringing this action.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

a.  Judgment in favor of Plaintiff;

b.  Declare that Defendants have violated the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1983;

c.  An order requiring Defendants:

  i.  To reinstate Plaintiff's emeritus status;

  ii.  To provide Plaintiff with a new disciplinary process that provides due process;

  iii.  To permanently remove from Plaintiff's employment file any information related to the unlawful and flawed proceeding; and

  iv.   Not to disclose the wrongful discipline to any third party.

d.  Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. § 1988.

e.  Further relief as this Court may deem just and proper.


## JURY DEMAND

Bradley M. Peterson hereby demands a trial by jury in this matter.

Respectfully submitted,

/s/ Tracy L. Turner

_____

Tracy L. Turner, Of Counsel (0069927)
Rosenberg & Ball Co. LPA
205 South Prospect St.
Granville, OH 43023
(614) 657-3454
tturner@rosenbergball.com

Attorney for Plaintiff, Bradley M. Peterson