**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRADLEY M. PETERSON, PhD, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:22-cv-00276 |
| | : | |
| v. | : | Judge Edmund A. Sargus |
| | : | |
| KRISTINA M. JOHNSON, PhD, *et al.*, | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| Defendants. | : | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

I.     **INTRODUCTION**

After a distinguished career contributing to the growth and success of The Ohio State University ("OSU"), Defendant Kristina M. Johnson, PhD, President of OSU, and its then Executive Vice President and Provost, Defendant Bruce A McPheron, PhD[1], abruptly revoked Dr. Peterson's emeritus status and banned him from campus, which resulted in the loss of significant career opportunities for which he had a legitimate claim of entitlement, through a discriminatory and procedurally flawed process. Dr. Peterson was found responsible for harassment based on allegations that were not true and, even if true, did not rise to the level of harassment. In doing so, Defendants failed to give Dr. Peterson the most basic of due process rights – notice, a hearing, and the right to cross-examine witnesses. Defendants' actions removing Dr. Peterson from his position violated Dr. Peterson's constitutional rights.

---

[1] As set forth in Section III.D, based on Defendants' representation and pursuant to Fed. R. Civ. P. 25(d), Melissa Gilliam, M.D., Executive Vice President and Provost shall be substituted in all future filings for Dr. McPheron.

Defendants' argument that Dr. Peterson did not have a property interest in his emeritus status misses the mark. Defendants misinterpret case law and disregard its own policies and procedures relating to emeritus faculty. Defendants denied Dr. Peterson due process because it is under immense pressure to harshly discipline males accused of sexual misconduct in the wake of years of negative publicity relating to its handling of sexual misconduct allegations. Peterson agrees that OSU should be taking allegations of sexual harassment and misconduct seriously, but the allegations against him do not rise to the level of harassment. One person got upset with Dr. Peterson's mannerisms and gathered several others to file complaints about him making them feel "uncomfortable" with his manner of communication and interacting. The result of the investigation was a foregone conclusion rather than a fair and impartial proceeding with procedural safeguards. Dr. Peterson has stated a claim pursuant to 42 U.S.C. § 1983 requiring denial of Defendants' Motion to Dismiss.

## II.  STATEMENT OF FACTS

### A.  Dr. Peterson's Career at OSU

Dr. Peterson had a long and distinguished career in the astronomy department at OSU that contributed to its increased academic rankings. He began his career at OSU in 1979 as a Postdoctoral Researcher and worked his way through the ranks of Assistant Professor, Associate Professor with tenure, Professor, Vice Chairman of the Department of Astronomy, and Chair of the Department of Astronomy until his retirement in 2015. (Doc No. 1, Complaint at ¶ 10) (hereinafter "Compl., ¶") Dr. Peterson was a leading and accomplished researcher and publisher in the field of astronomy bringing recognition and funding to OSU. (Compl., ¶¶ 11-12)

On June 30, 2015, Dr. Peterson retired from OSU and was granted emeritus status. (Compl., ¶ 13) From fall 2016 to fall 2018, Dr. Peterson taught as Distinguished Visiting

2

Astronomer at the Space Telescope Science Institute ("STScI"). Notably, STScI recognized Dr. Peterson's accomplishments in helping female scientists succeed in the field and asked for his input on improving its program to do the same (Compl., ¶ 14)

In October 2018, Dr. Peterson returned to OSU full-time as an emeritus professor but continued his (1) a study he was involved with, the LUVOIR study, for presentation to NASA and the National Academy of Sciences, (2) original research on the inner structure of quasars, and (3) preparation of a second edition of his leading textbook, "Foundations of Astrophysics". As an emeritus professor, Dr. Peterson was retired, but he and OSU continued their relationship for both to benefit from his stature and ongoing research. (Compl., ¶¶ 11, 12, 14-15)

Prior to his retirement, Dr. Peterson had no complaints filed against him and no disciplinary issues during his 36 years of employment at OSU. (Compl., ¶ 16) However, upon his return to OSU in 2018, the department chair verbally informed Dr. Peterson that some female professors felt uncomfortable around him and asked him to avoid hugs and casual touching (such as a hand on the arm or shoulder) and dinners and meetings without others present. There was no complaint, investigation, or opportunity to respond. However, Dr. Peterson did comply with the requests from the chair. (Compl., ¶ 17)

**B. The Harassment Complaints**

Despite his compliance and hearing nothing more, two years later, in April 2020, OSU's Office of Institutional Equity ("OIE") notified Dr. Peterson that a harassment complaint had been filed against him. Three women banded together to file the complaint, Laura Lopez, Assistant Professor of Astronomy at OSU, Amy Sardone, NSF Postdoctoral Fellow, OSU Department of Astronomy, and Emily Margolis, Graduate Student in the Department of History of Science and Technology, John Hopkins University. (Compl., ¶ 18) Remarkably, after his esteemed career at

3

OSU, Dr. Peterson was subjected to an unfair and biased Title IX process that deprived him of property interests without due process relating to allegations that were years old, did not involve conduct, employees, or students of OSU, and involved individuals over whom Dr. Peterson held no supervisory authority. (Compl., ¶ 19) OSU was motivated to do so to avoid additional negative publicity in the wake of its mishandling of past sexual harassment allegations. (Compl., ¶ 20)

None of the three allegations for which Dr. Peterson received notice rose to the level of harassment under OSU's Sexual Misconduct, because each involved non-sexual touches or comments and a general feeling of discomfort (Compl., ¶¶ 20-28) Complainant Lopez organized the complaints. (Compl., ¶ 25) Her complaint was based on the dinner that happened five years prior and other random, non-sexual comments. (Compl., ¶ 23) Lopez had complained about this dinner to the chair five years earlier, when Dr. Peterson was employed, and it was determined at that time that no complaint should be filed based on the reported behaviors. (Compl., ¶ 22) As Dr. Peterson explained during the investigation, he took her to dinner when she visited OSU prior to beginning her employment, as had been done with all other new hires, and that his behaviors at dinner were neither sexual nor harassment. He went alone with her to dinner because he tried to get others from the department to join, but no one else was available or willing. (Compl., ¶ 24)

The other two complaints were equally meritless. Sardone complained she was uncomfortable because Dr. Peterson attended a few meetings she led, general discussions on topics of harassment not directed at her or sexual in nature, and rumors she heard that he sometimes hugged others, even though she admitted he never touched or hugged her, and she never witnessed him touch others. (Compl., ¶¶ 26-27)

Margolis had no affiliation to OSU and Dr. Peterson's interactions with her took place when he was working in Maryland at STScI, not OSU. Even though OSU had no jurisdiction or

4

authority to investigate the relationship of a retired professor with another person at another institution in another city, Dr. Peterson explained that his relationship with Margolis was simply friendly and that her allegations, which consisted of invitations to get together with no touching, inappropriate comments, or sexual advances, were not harassment. (Compl., ¶ 28)

### C. The Investigation

OIE assigned Allan Williams to investigate the complaint. Williams began investigating before sending notice to Dr. Peterson. Williams interviewed Lopez and Margolis, but Sardone would only submit a written statement, and witnesses. On April 27, 2020, only after these interviews were conducted did OSU send notice to Dr. Peterson. (Compl., ¶ 29) Dr. Peterson denied the allegations in writing and met with Mr. Williams for an interview on April 29, 2020. (Compl., ¶ 30-31) During the interview, Dr. Peterson learned he had not been given notice of all the allegations against him and was misled to believe this was the beginning of the investigation. (Compl., ¶ 31) Dr. Peterson denied all harassment allegations during the interview with Mr. Williams and expressed surprise that his interactions were interpreted in the way described, particularly because of the modifications he had made since returning in 2018. (Compl., ¶ 32) Williams told Dr. Peterson the likely outcome of the investigation was training but did not inform him of the possibility of losing his emeritus status. (Compl., ¶ 33)

Williams never contacted Dr. Peterson for additional information following this initial interview and did not respond to Dr. Peterson's requests for an update or request for a university representative to guide him through the process. (Compl., ¶ 34) Astoundingly, OSU allowed another witness to join as a complainant during the investigation but never gave Dr. Peterson notice or an opportunity to respond to her allegations. (Compl., ¶ 35) This individual, Susan Kassin, also had no affiliation with OSU, and generally complained that Dr. Peterson made her feel

uncomfortable but had no specific sexual harassment complaints. (Compl., ¶¶ 35-36) Had Dr. Peterson been interviewed, he would have denied Kassin's allegations that he flirted with her, but honestly, even if true, it is not harassment for Dr. Peterson to flirt with a tenured female professor at another institution over which he held no supervisory authority. (Compl., ¶¶ 35-37)

Mr. Williams purposefully excluded material information Dr. Peterson provided in his interview from the investigation report. Dr. Peterson disputed all allegations and disputed the credibility of his accusers. However, the investigator either omitted or changed Dr. Peterson's testimony to create the false impression that there was no credibility dispute to avoid providing Dr. Peterson a hearing with the right to cross examination. (Compl., ¶ 38) Williams investigated to find Dr. Peterson responsible rather than conducting a fair and neutral investigation, including but not limited to: (a) failing to include information Dr. Peterson provided in the investigation report; (b) failing to investigate if Dr. Peterson treated male employees similarly; (c) asking for names of or interviewing witnesses to support Dr. Peterson; (d) failing to conduct a thorough examination to support a finding that there was a long pattern of harassment; (e) including information that someone warned Lopez about Dr. Peterson without even asking for the source of this warning; (f) either not asking for or purposefully excluding from the report alleged correspondence documenting the harassment, but relying on it nonetheless; (g) failing to consider the modifications Dr. Peterson made following the discussion with the chair in 2018; (h) not investigating if the alleged harassment caused any actual harm; and (i) not interviewing other individuals who worked with Dr. Peterson during the alleged period of harassment. (Compl., ¶ 39)

Williams also misstated the testimony of witnesses in the investigation report and did not provide them the opportunity to review their statements. He also purposefully excluded witness testimony that was helpful to Dr. Peterson, as confirmed by Witness 2. (Compl., ¶ 40) Contrary to

Williams' summary, the witness testimony does not support the finding of harassment. (Compl., ¶ 41)

On February 1, 2021, Dr. Peterson received the investigation report from Williams. The report concluded that Dr. Peterson had violated OSU's Sexual Misconduct Policy 1.15, sexual harassment because of his non-sexual hugging and touching of others on the arm or shoulder during conversation and inviting female colleagues to dinner (with no investigation into whether he touched male colleagues similarly or invited male colleagues to dinner). Astonishingly, the OIE report concluded that the Complainants provided a twenty-plus year history of harassment. This is untrue and unsupported. The earliest complaint was in 2015 and none of the complainants even worked at OSU when Dr. Peterson was chair of the department. (Compl., ¶ 42)

### D. Emeritus Status Revocation

On February 10, 2021, Interim Chair of Astronomy Todd Thompson and Divisional Dean Susan Olesik informed Peterson via Zoom that the OIE Report and OSU policy allow no course other than to recommend revoking Dr. Peterson's emeritus status. Accordingly, Drs. Thompson and Olesik wrote to Gretchen Ritter, Executive Dean and Vice Provost of the College of Arts and Sciences to recommend revocation of emeritus status on that same day. They accepted the finding of the investigation report, including but not limited to the finding that the report documented "behavior over the course of twenty plus years" even though the investigation only covered alleged conduct from 2015-2020. (Compl., ¶ 44) On February 18, 2021, Dr. Ritter wrote to McPheron endorsing Drs. Thompson and Olesik's recommendation to revoke Dr. Peterson's emeritus status. (Compl., ¶ 45)

On May 17, 2021, Johnson informed Peterson that she would recommend revocation of his emeritus status to OSU's Board of Trustees during their meeting on May 19-20, 2021. In the letter

to the Board of Trustees, Johnson mischaracterized the situation and stated that Dr. Peterson had engaged in persistent and pervasive harassment for twenty years. As with the other administrators involved, she accepted the OIE Report without independently reviewing the information. (Compl., ¶ 46) The Board of Trustees accepted Johnson's recommendation and revoked Dr. Peterson's emeritus status on May 20, 2021. The decision was widely publicized and made known to the public. (Compl., ¶ 47)

In accordance with OSU's Bylaws and Rules, Dr. Peterson was a faculty member of OSU. *See* Ohio Admin. Code 3335-5-19, Faculty ("As used in these rules the term "faculty" shall include persons appointed by the Board of Trustees with tenure-track and non-tenure track titles on full or part-time appointments, with or without salary, and emeritus faculty."). (Compl., ¶ 48) Dr. Peterson was granted emeritus status upon his retirement due to his accomplishments, contributions to OSU, age, and years of service. *See* OSU's Bylaws and Rules, Ohio Admin. Code 3335-5-36(A). (Compl., ¶ 48) OSU investigated and disciplined Dr. Peterson pursuant to its Sexual Misconduct Policy 1.15. Unlike other faculty, however, Defendants provided Dr. Peterson with no hearing, no right to cross-examination, and no appeal process. (Compl., ¶ 50) Dr. Peterson's emeritus status was necessary to his scholarship and standing in the academic community. Based on OSU's report and revocation of Dr. Peterson's emeritus status, the organizations with which Dr. Peterson had relationships with to perform research, writing, and other work ended their relationship with him. (Compl., ¶ 51)

As a result of Defendants' actions, Dr. Peterson has been deprived of the following protectable property interests without due process: (a) his emeritus status at OSU and all related benefits; (b) his position as Distinguished Visiting Astronomer at STScI; (c) loss of his large Hubble Space Telescope science program, which others will now complete and receive the

8

recognition; (d) loss of his textbook contract with Cambridge University Press after six months of work on a second edition; and (e) permanent reputational damage and loss of earnings. (Compl., ¶¶ 52-53)

OSU deprived Dr. Peterson of the property interest in his emeritus status without due process by, for example: (a) not providing him notice of the allegations against him; (b) not affording him a fair investigation with neutral and unbiased investigators and decision makers; (c) not providing him a hearing and the right to cross-examination even though the case involved allegations of sexual misconduct and hinged on credibility determinations; and (d) investigating complaints outside the jurisdiction of the Sexual Misconduct Policy. (Compl., ¶ 54) OSU found Dr. Peterson responsible based on pressure arising from prior investigations by the DOE into its handling of sexual misconduct cases, the Strauss investigation, and being forced to shutter its Office of Sexual Civility and Empowerment, which it formed to settle the DOE's investigation into its handling of sexual misconduct claims. Due to this pressure, OSU took the unnecessary step of referring the matter to the Board of Trustees resulting in widespread publication and causing damages to Dr. Peterson. (Compl., ¶ 55)

### III.  LAW AND ARGUMENT

#### A.  Standard of Review

Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted but have not presented arguments to support their motion. Plaintiff's claim survives under Rule 12(b)(6) because it contains sufficient factual allegations on its face to state a plausible claim for relief. *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiff stated a

plausible claim for relief because he pled factual content allowing this Court to draw the reasonable inference that Defendants are liable for the alleged misconduct. *Id*. For purposes of this motion, the Court must construe the allegations in the Complaint in the light most favorable to Plaintiff and accept all the allegations as true. *Id*. (*citing Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). As set forth in the preceding paragraphs, the Court should deny Defendants' motion to dismiss, or at a minimum allow Plaintiff the opportunity to amend.

### B.  Plaintiff Has Pled a Claim for Relief Under 42 U.S.C. § 1983

Dr. Peterson alleges in his Complaint that Defendants revoked his emeritus status with OSU without affording him the procedural due process to which he is entitled. To bolster their arguments, Defendants mischaracterize Dr. Peterson's claims as attempting to argue that he is claiming employment, due to one scrivener's error in a single paragraph of the Complaint.[2] However, as clearly stated in the Complaint, this is not the case. (*See* Compl., ¶¶ 1, 13, 15, 27, 33, 44-54, & Prayer for Relief) This case presents the unique question of whether Dr. Peterson has a protected property interest in his emeritus status at OSU such that he was entitled to procedural due process, including notice of the allegations against him, a hearing, and the right to cross-examine witnesses. As established below, Dr. Peterson has adequately pled his claim.

To plead his procedural due process claim, Dr. Peterson must allege a property interest in his emeritus status and that Defendants failed to provide sufficient process in depriving him of that interest. *See Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009) (finding professor held property interest in Graduate Faculty Status, i.e., the ability to supervise graduate students); *Smock*

---

[2] If the Court deems it necessary, Plaintiff will amend the Complaint to correct this inadvertent typographical error. (*See* Compl., § 64)

*v. Bd. of Regents of Univ. of Mich.*, 353 F.Supp.3d 651, 655-6 (E.D. Mi. 2018) (finding professor held property interest in sabbatical leave and overseeing graduate students).

1. Dr. Peterson Has Alleged a Property Interest in His Emeritus Status.

As to the first element, Dr. Peterson alleges that his emeritus status conferred on him a property interest protected by the Due Process Clause of the Fourteenth Amendment. (Compl., ¶ 51-52, 64) The determination of whether a property interest exists is whether Dr. Peterson held a legitimate claim of entitlement to his emeritus status. *See Gunasekera*, 551 F.3d at 467-68; *Smock v. Bd. of Regents of Univ. of Mich.*, 353 F.Supp.3d 651, 656 (E.D. Mi. 2018). "Property interests are created by state law or 'existing rules or understandings,' not the Constitution, and employment privileges can become property interests when they are sufficiently secured as to be legitimate entitlements." *Id.* (citing *Town of Castel Rock, Colorado v. Gonzalez*, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005)); *see also Frost v. University of Louisville*, 392 F.Supp.3d 793 (E.D. Ky. 2019) ("A property interest can be created by a state statute, a formal contract, or a contract implied by the circumstances") (internal citations omitted). "'Property interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1971). For example, constitutionally protected property interests of faculty members at universities extend to benefits of their current of past employment for which they hold a legitimate claim of entitlement. *See Smock*, 353 F.Supp.3d at 656-57 (holding that sabbatical time and graduate student advisor roles are protected property interests because there is no discretion as to granting these benefits and the benefits are necessary to her research, scholarship, and maintaining standing in academia).

Emeritus professors are faculty members of OSU. *See OSU's Bylaws & Rules*, Ohio Admin. Code. 3335-5-19(C). Dr. Peterson was granted emeritus status at retirement in recognition

11

of sustained academic contributions to the university. *Id*. Emeritus status is one of the privileges to which he was entitled because he was employed as a full-time tenured faculty member who dedicated over twenty-five years of service to OSU at the time of his retirement. *See OSU's Bylaws & Rules*, Ohio Admin. Code 3335-5-36(A). Once granted, Dr, Peterson was entitled to his faculty appointment as emeritus status as a benefit of his employment relationship with and contributions to OSU. Continuation of emeritus status was not discretionary but continued indefinitely unless terminated for cause, and even then, only by action of the Board of Trustees. *See OSU's Bylaws & Rules*, Ohio Admin. Code. 3335-5-36(E); *see also Gunasekera*, 551 F.3d at 467-68 (finding a property interest based on custom and practice of the university in not revoking graduate faculty status once granted); *Frost*, 392 F.Supp.3d 793, 801-04 (finding assistant professor had protected property interest in employment that could only be terminated for cause, even though the contract was only for the academic year).

Additionally, the deprivation of Dr. Peterson's emeritus status was of a constitutional level because it ended his esteemed career. Although retired, Dr. Peterson continued researching, writing, and working in academia for his and OSU's benefit (Compl., ¶¶ 10-15) Emeritus status was necessary to his scholarship and standing in the academic community. As a result of the revocation of his emeritus status, this all ended, causing him a loss of pay, current and future opportunities, and reputational harm that rises to the level of a constitutional deprivation. *See Gunasekera*, 551 F.3d at 468 (finding a summer stipend that supplementing annual salary to be a property interest); *Smock*, 353 F.Supp.3d at 656-57 (finding denial of sabbatical time and graduate student advisor roles to a tenured faculty member to be protected property interests). Thus, Dr. Peterson has pled the existence of a protected property interest in his emeritus status.

2. <u>OSU Failed to Provide Dr. Peterson with Sufficient Process</u>.

As to the second element, Dr. Peterson was not provided sufficient process before being deprived of his property interest in his emeritus status as he was not provided notice of the allegations against him or a hearing. (Compl., ¶ 17, 22, 31, 35, 38, 50) "Notice and an opportunity to be heard remain the most basic of requirements of due process." *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005). Dr. Peterson was provided preliminary notice of an investigation, but not provided the details until he appeared for the interview. (Compl., ¶ 31) For the last complainant added to the complaint, Dr. Peterson was provided no notice. (Compl., ¶ 35)

There was no hearing. However, OSU's Bylaws & Rules provide for a hearing for every other faculty member and student accused under the Sexual Harassment Policy. *See* Bylaws & Regulations, Ohio Adm. Code 3335-5-04.3 & OSU's Non-Discrimination, Harassment & Sexual Misconduct Policy (formerly named Sexual Misconduct Policy), https://policies.osu.edu/assets/policies/Policy-NDH-Sexual-Misconduct.pdf (last accessed May 20, 2022). The same is true for the case law, yet Defendants ask this Court to find that a professor who dedicated his career to OSU and earned emeritus status as a privilege of his employment, be denied the most basic of due process rights when faced with one of the most serious of allegations. *See, e.g., Miami Univ.*, 882 F.3d at 599-600.

Moreover, Dr. Peterson was not provided the right to cross-examination. (Compl., ¶ 38, 50) In sexual misconduct cases, the Sixth Circuit has unequivocally held that an accused has the right to cross-examine witnesses at hearing where credibility is at issue. *See Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402 (6th Cir. 2017). In the instant case, there are competing narratives that required cross-examination to allow Dr. Peterson to address these serious allegations that were highly publicized and carried serious consequences.

*Frost*, 392 F.Supp.3d at 804-05. Accordingly, Dr. Peterson has adequately pled that he was deprived of a property interest without being provided sufficient process.

        3.   <u>OSU Misinterprets the Case Law</u>.

OSU's brief contains no analysis of the Section 1983 procedural due process case law. Rather, OSU's arguments for dismissal rest on a misinterpretation of *Samad v. Jenkins*, 845 F.2d 660 (1988). OSU argues that *Samad* creates a blanket rule that no professor at any university can ever have a property or liberty interest in their emeritus status. *Samad* holds no such thing and has no factual relevancy to this case. Unlike Plaintiff, Professor Samad had not yet been granted emeritus status or even retired. Instead, he voluntarily resigned pursuant to a settlement agreement to avoid termination for cause. In that settlement agreement, he agreed to have no affiliation with the University of Akron School of Law following the end of the academic year. *Id.* at 661. The Court held that he had no property interest in the right to a vote as to whether he should be granted emeritus status ***because he gave up that right in the settlement agreement***. *Id.* at 662-63

Defendants conspicuously omit sentences from the quote at page 6 of its brief that make clear the decision in *Samad* was based on an analysis of the settlement agreement and not the nature of emeritus status. The portions Defendants' omitted state:

> The University has not, in any way, failed to live up to its agreement. We specifically reject plaintiff's argument that he was denied his property rights when he was not granted emeritus status. Such status can be afforded only if the Law School faculty votes favorably to do so. The Settlement Letter of February 14, 1984 makes no mention that the school must put Samad's name to a vote. In fact, the implication is clearly to the contrary. Finally, we do not believe that plaintiff possesses a property right, in the absence of such a Settlement Letter, to force the faculty to vote.

In *Samad*, the Sixth Circuit did not analyze whether emeritus status, when already granted, confers a property interest. Rather, it analyzed whether a professor held a property interest in forcing a vote for emeritus status through a settlement agreement where he plainly gave up that right to

avoid discipline. *Id*. at 661-63. Thus, the case has no applicability here and does not preclude Plaintiff's claims or require dismissal[3].

### C. Defendants Are Not Entitled to Qualified Immunity.

Dr. Peterson's claims against Defendants are brought in their official capacities for injunctive relief and in their individual capacities for damages. (Compl., ¶¶ 57-58) Defendants seek qualified immunity for the claims brought against them individually for damages. (Doc. 45, pp. 8-9) Qualified immunity is an affirmative defense available to shield state officials from monetary damages liability. *See Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281, 302 (6th Cir. 2019) ("We note, however, that qualified immunity "'only immunizes defendants from monetary damages'—not injunctive or declaratory relief.") (internal citations omitted). A complaint should not be dismissed based on qualified immunity if the alleged facts show the official's conduct violated a clearly established constitutional right. *See Gunasekera*, 551 F.3d at 471 (*citing Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

For the reasons state above, and just as in the *Gunasekera* case, Defendants are not entitled to qualified immunity because Defendants deprived Dr. Peterson, a long-time faculty member, of his legitimate entitlement to emeritus status without notice of the allegations against him and a hearing. The revocation of emeritus status cost him pay and benefits. The right to notice of allegations and a hearing are clearly established rights Defendants reasonably should have known Dr. Peterson was entitled to receive. *See Gunasekera*, 551 F. 3d at 471; *see also Miami*, 882 F.3d at 604. This is even more true given the fact that Dr. Peterson was accused of sexual harassment because the Sixth Circuit had made clear by the time of Dr. Peterson's discipline that he had the right to cross-examine his accusers in such cases. *See Baum*, 903 F.3d 575; *Univ. of Cincinnati*,

---

[3] Likewise, OSU cites to cases in Section II.A addressing the standards for claims asserting a liberty interest that do not apply to Dr. Peterson's claims.

872 F.3d at 402. Moreover, federal regulations had been implemented under Title IX requiring notice, a hearing, and the right to cross-examine witnesses in university sexual harassment matters. *See* 34 CFR 106.45.

For these reasons, Defendants are not entitled to qualified immunity.

### D. If Defendant McPheron Is No Longer Able to Grant the Requested Relief, Then His Successor Is Substituted as the Named Defendant.

Defendant McPheron remains employed with OSU. However, based on OSU's representation that he is no longer able to grant the requested relief, the appropriate remedy is substitution of his successor, Dr. Melissa Gilliam. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution." Accordingly, and as referenced in Footnote 1, Plaintiff will substitute Dr. Gilliam for Dr. McPheron going forward.

### IV.   CONCLUSION

For all the reasons stated herein, the Court should deny Defendants' Motion to Dismiss Plaintiff's Complaint in its entirety. If the Court disagrees and finds that Plaintiff has not pled sufficient facts to plausibly allege his claim, then he respectfully requests leave, pursuant to Fed. R. Civ. P. 15(a), to cure any pleading deficiencies.

Respectfully submitted,

/s/ Tracy L. Turner
Tracy L. Turner, OH Bar No. 069927
Of Counsel
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, OH 43023
Telephone: 614.657.3454
Facsimile: 866.498.0811
tturner@rosenbergball.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, using the CM/ECF system, which will send notification of such filing to counsel for Defendants and all counsel of record in this matter.

/s/ Tracy L. Turner
Tracy L. Turner

17